## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jan 29 2018, 8:50 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of L.N.R. (minor child) and A.R. (Mother),

A.R.

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

January 29, 2018

Court of Appeals Case No.
21A01-1709-JT-2178

Appeal from the Fayette Circuit Court

The Honorable Hubert Branstetter, Jr., Judge

Trial Court Cause No.
21C01-1705-JT-161

**Mathias, Judge.**

[1] A.R. ("Mother") appeals the order of the Fayette Circuit Court terminating her rights to her minor child, L.N.R. ("Son"). On appeal, Mother argues that the Indiana Department of Child Services ("DCS") presented insufficient evidence to support the trial court's decision to terminate her parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Son was born to Mother and J.R. ("Father") in October 2015. On July 19, 2016, DCS filed a petition alleging that Son was a child in need of services ("CHINS") based on Mother using drugs and allowing drugs in her home. Specifically, Mother had tested positive for use of methamphetamine, amphetamine, and suboxone. The CHINS petition also noted that Mother had reported a history of domestic violence between her and Father. The trial court held an initial detention hearing the day after the petition was filed and placed Son in foster care.

[4] At a hearing held on August 17, 2016, Mother and Father both admitted that Son was a CHINS. Mother admitted that she had tested positive for both marijuana and methamphetamine and was in need of substance abuse treatment. At a dispositional hearing held on September 30, 2016, the trial court ordered Mother *inter alia* to: (1) contact the DCS family case manager on a weekly basis; (2) keep all appointments; (3) maintain safe, suitable, and stable housing; (4) refrain from using, manufacturing, or distributing illicit drugs and take medications only as prescribed; (5) not allow the use of any illicit drugs in

Mother's home or in the presence of Son; (6) refrain from engaging in criminal activity; (7) submit to random drug and alcohol testing; (8) meet medical and mental health needs in a timely and complete manner, including following the directions of medical practitioners, attending all appointments, and taking medications as prescribed; (9) attend all scheduled visitations with Son and comply with the visitation rules and procedures; (10) provide Son with a safe, secure, and nurturing environment free from abuse and neglect, and become an effective caregiver who possesses the necessary skills, knowledge, and abilities to provide this sort of environment in the long term to provide Son with permanency; and (11) complete a substance abuse assessment, follow all recommended treatments, and successfully complete all treatment recommendations developed as a result of the substance abuse assessment. Ex. Vol., Petitioner's Ex. 5, pp. 1–3.

[5] Mother was referred to Sheila Martin ("Martin") at Centerstone for case management and supervised visitation. Mother was given visitation twice weekly for two hours per session. But Mother did not consistently attend visitation. She was offered forty visits and attended twenty-six. When Mother did attend, she occasionally acted inappropriately. Mother fell asleep during some visits. During one visitation, Martin transported both Mother and Son to the visitation. But during the trip, Mother began to act paranoid and stated that someone was trying to take her child. Mother then took Son out of his car seat and began to kick the console of the car. This caused Martin to end the visit early. On another occasion, Martin ended a visitation early when Mother

pulled her pants and underwear down and began to scratch herself during a visit in a public park.

[6] Due to Mother's sporadic attendance at visitation, Martin decided that Mother would have to arrive at visitation prior to Son being transported to the visitation location. When Mother subsequently missed two scheduled visitations, further restrictions were placed on Mother's visitation, but Mother did not comply, and her visitation referral was closed in April 2017. Mother did visit Son on July 6, 2017. As of the date of the termination hearing on August 2, 2017, Mother had not seen her son since July 6.

[7] Mother's progress in case management was similarly unsuccessful. Martin gave Mother assistance in life skills, parenting skills, anger management skills, and aid in finding employment and housing. Mother was scheduled to meet with Martin on a weekly basis but failed to do so. Mother sometimes met with Martin only once per month. And when she did attend, Mother was frequently late, often as late as thirty minutes to a one-hour session. As a result, Mother did not successfully complete the case-management services.

[8] Perhaps most concerning was Mother's failure to participate in substance abuse treatment. Mother did complete a substance abuse assessment on August 2, 2016, at Centerstone. Based on the assessment, Centerstone recommended that Mother attend "detox" and participate in inpatient treatment. Tr. p. 51. Centerstone referred Mother to Harbor Lights for treatment and gave her a fuel card so that she could travel to Harbor Lights. Mother, however, did not go and

claimed she lost her fuel card. Eventually, on October 25, 2016, Mother entered Harbor Lights for detox and treatment. But Mother only stayed for a day and a half before she left and did not successfully complete the program.

[9] On September 12, 2016, Mother was referred to intensive outpatient treatment at Centerstone. However, Mother only attended approximately half of the group sessions, delaying her progress in the curriculum. Thinking that Mother would do better with an individual approach to treatment, Centerstone referred her to a recovery coach, Julie Newbold ("Newbold") in March 2017. Mother only attended recovery coaching with Newbold three times and never completed treatment.

[10] On February 14, 2017, Mother entered treatment on her own at Valle Vista. Mother was discharged from treatment three days later, and Valle Vista recommended that she continue to participate in treatment at Centerstone. Mother also went to Recovery Works on March 11, 2017, but left after one day. She returned on April 10, 2017, but left after only five days. Both times Mother left against medical advice. On June 29, 2017, Mother was referred to Meridian for detox and inpatient treatment. Mother had not yet attended at the time of the August 2, 2017 termination hearing.

[11] At the termination hearing, Mother, who was then twenty-four years old, admitted that she had been using illicit drugs since she was approximately nine years old, when she began to use marijuana. In addition to her admitted use of

methamphetamine and marijuana, Mother also admitted to having used amphetamine, morphine, and suboxone.

[12] Throughout the course of the CHINS proceedings, Mother tested positive for illicit drug use, mostly methamphetamine, eight times. Additionally, Mother was charged on July 6, 2017 with Level 6 felony possession of a narcotic drug, Level 6 felony unlawful possession of a syringe, and Class B misdemeanor visiting a common nuisance.[1] Mother also has a prior conviction for Class B felony dealing in a controlled substance. As a result of the most recent charges, Mother was in jail and released on bond only the day before the termination hearing.

[13] Mother also failed to maintain stable housing. During the CHINS proceedings, Mother lived "on and off" with her grandmother for approximately a year and a half and was frequently homeless. Tr. pp. 20, 52. Since being released from incarceration, Mother resided with her mother and stepfather. Mother was unemployed during the majority of the CHINS proceedings, and was unemployed at the time of the termination hearing.

[14] After being removed from Mother's care, Son was initially placed in a foster home. In October 2016, he was placed with Father for a trial home visit. After only a week, however, Father stated that he could not care for Son due to his

---

[1] Mother notes in her brief that, according to the publicly accessible docket, her trial on these charges was set for December 11, 2017. As of the date of this opinion, Mother's trial had been rescheduled for March 19, 2018.

own poor health, and Son was returned to foster care. Almost five months prior to the termination hearing, Son was placed in relative foster care with his paternal aunt and uncle, who plan to adopt the child. Son is doing well in his current placement.

[15] On May 2, 2017, DCS filed a petition to terminate the parental rights of both Mother and Father. The trial court held an initial hearing on the petition on May 31, 2017, and appointed counsel for Mother.[2] The trial court conducted an evidentiary hearing on the termination petition on August 2, 2017, at the conclusion of which it took the matter under advisement. On September 5, 2017, the trial court entered findings of fact and conclusions of law granting DCS's petition and terminating Mother's parental rights. Mother now appeals.

## Termination of Parental Rights

[16] We have often noted that the purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for the termination of such rights when the parents are unable or unwilling to meet their responsibilities as parents. *Id*. Indeed, the parents' interests must be subordinated to the child's interests in determining

---

[2] Father subsequently consented to the termination of his parental rights and does not participate in this appeal.

the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[17] The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[18] The burden is on DCS to prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1261. As Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id.* at § 8(b).

[19]     We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id*. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[20]     Indiana Code section 31-35-2-8(c) now[3] provides that the trial court "*shall* enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" to either terminate a parent-child relationship or to dismiss the termination petition. *See* Ind. Code § 31-35-2-8(c) (emphasis added). When the trial court enters such findings and conclusions of law, we apply a two-tiered standard of review. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. We first determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains

---

[3] Indiana Code section 31-35-2-8 was amended in 2012 to add the requirement that the trial court enter findings of fact. *See* Pub. L. No. 128-2012; *see also In re N.G.,* 61 N.E.3d 1263, 1265 (Ind. Ct. App. 2016) (noting 2012 amendment to require findings of fact supporting trial court's decision to either grant or dismiss a petition to terminate parental rights).

no facts to support them either directly or by inference." *Id*. (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)). If the evidence and inferences support the trial court's decision, we must affirm. *Id*.

## Discussion and Decision

[21] On appeal, Mother challenges the sufficiency of the evidence supporting the trial court's decision to terminate her parental rights. Specifically, Mother claims that there is insufficient evidence to support the trial court's conclusions that there was a reasonable probability that the conditions which led to the child's removal from Mother's care would not be remedied, that the continuation of the parent-child relationship posed a threat to the well-being of the child, and that termination of Mother's parental rights was in the child's best interests.

[22] Before we address Mother's arguments regarding the statutory factors DCS was required to prove, we first address Mother's argument that the trial court's finding of fact 8 ("Finding 8") is clearly erroneous. Finding 8 states that the dispositional order was issued on "March 30, 2016." Appellant's App. p. 69. As DCS admits, the dispositional order was actually issued on September 30, 2016. *See* Ex. Vol., Petitioner's Ex. 5. Mother, however, makes no argument as to how she was prejudiced by this relatively minor error. Indeed, she admits that the statutory time requirements were met. *See* Appellant's Br. at 18. We therefore can see no reversible error in the trial court's erroneous finding. *See Barker v. City of W. Lafayette*, 894 N.E.2d 1004, 1010 (Ind. Ct. App. 2008)

(holding that trial court's use of the word "unreasonable" instead of "reasonable" was a harmless scrivener's error), *trans. denied.*

[23] Mother also claims that Finding 8 is clearly erroneous in that it states that the dispositional decree required her to "[e]nroll in all programs recommended by the DCS Family Case Manger and/or service providers within a reasonable time, not to exceed thirty days," and "[e]nsure the Child is properly clothed, fed and supervised." Appellant's App. p. 69. DCS admits that the trial court's dispositional order did not include this language. DCS argues, and we agree, that the trial court's error in this regard does not affect the trial court's ultimate conclusions regarding the termination of Mother's parental rights. And again, Mother makes no argument that she was prejudiced by these factually incorrect findings.

*A. Conditions Which Led to Child's Removal*

[24] Mother claims that the trial court erred in determining that the conditions which led to Son's removal from Mother or his placement outside Mother's home will not be remedied. In deciding whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S.*, 987 N.E.2d 1150, 1156–57. However, the trial court may disregard efforts made only shortly before termination and weigh more heavily

a parent's history of conduct prior to those efforts. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[25] Mother claims that, although she has struggled with addiction, at the time of the termination hearing she was "turning her life around." Appellant's Br. at 16. However, Mother refers almost exclusively to evidence which does not favor the trial court's judgment, specifically her own testimony, which the trial court was under no obligation to credit.[4] The facts most favorable to the trial court's judgment show that Son was removed from Mother's care due to her use of and addiction to illicit drugs. Throughout the CHINS proceedings, Mother continued to test positive for illicit drug use and never completed the substance abuse treatment that she was referred to. Although Mother claimed to have completed detox at Valle Vista, she continued to test positive for drug use after she left Valle Vista. Thus, her treatment there was obviously not entirely successful. Indeed, Mother was arrested and charged with crimes relating to her drug activity on July 6, 2017.[5]

[26] Under these facts and circumstances, we cannot say that the trial court clearly erred in concluding that there was a reasonable probability that the conditions that resulted in Son's removal from Mother's care, or the reasons for Son's

---

[4] For example, citing only her own testimony, Mother claims that she completed the detox program at Valle Vista in February 2017 and earlier completed a six-month recovery program at Crossroads Recovery.

[5] Mother claims that these charges are "erroneous" and that she was criminally charged when she assisted her sister during a drug overdose. Tr. pp. 82, 88, 91. Again, the trial court was within its role as the finder of fact to discredit Mother's explanation for the criminal charges against her.

continued placement outside Mother's home, i.e., Mother's use of illicit drugs, would not be remedied.

### B. Continuation of Parent-Child Relationship

[27] Mother also argues that the trial court erred in determining that the continuation of the parent-child relationship poses a threat to Son's well-being. Because we conclude that DCS proved that there was a reasonable probability that the conditions which resulted in Son's removal from Mother's care would not be remedied, we need not address Mother's arguments directed at the threat prong of Indiana Code section 31-35-2-4(b)(2)(B). *See In re A.K.*, 924 N.E.3d at 220 (noting that section 4(b)(2)(B) is written in the disjunctive and that the trial court is required to find that only one prong of subsection (b)(2)(B) has been established).[6]

### C. Best Interests of the Child

[28] Mother lastly claims that the trial court clearly erred in concluding that termination of her parental rights was in the best interests of Son. In

---

[6] Even if we did consider Mother's argument under the threat prong, she would not prevail. In addressing the "threat" prong of section 4(b)(2)(B), the trial court must consider the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *A.D.S.*, 987 N.E.2d at 1157. The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id*. DCS is not required to provide evidence ruling out all possibilities of change. *Id*. Instead it needs to establish only that a reasonable probability exists that the parent's behavior will not change. *Id*. Here, despite her claim that there was no indication that she was using drugs in the presence of her child, Mother displayed bizarre behavior during at least two visitations. Mother repeatedly tested positive for the use of drugs, and she never established stable housing or employment, nor did she successfully complete any of the services DCS offered to her. Accordingly, the trial court did not clearly err in concluding that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of the child.

determining what is in the best interests of the child, the trial court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. The trial court must subordinate the interests of the parent to those of the child, and the court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.*

[29] Here, we note that Mother failed to complete any of the services offered to her. She repeatedly tested positive for use of illicit drugs. She did not complete any of the substance abuse programs to which she was referred. She did not consistently attend supervised visitation and, at on at least two occasions, acted in a bizarre manner during the visitation. Mother was also arrested for possession of illegal drugs and was still awaiting trial on these charges at the time of the termination hearing. Mother also failed to maintain stable housing or employment. And Son was doing well in relative foster care, and his foster parents intended to adopt him. In light of these facts, we cannot say that the trial court clearly erred in determining that termination of Mother's parental rights was in the best interests of Son.

[30] Still, Mother cites several cases in which Indiana appellate courts have reversed a trial court's decision to terminate parental rights, arguing that the trial court should have given her more time to prove herself to be a worthy parent. Mother relies heavily on *In re M.W.*, 943 N.E.2d 848 (Ind. Ct. App. 2011), *trans. denied*. In that case, the child was removed from his mother's care due to mother's incarceration, and while his father was also incarcerated. Although the father had not completed all the services offered to him, he did substantially comply

with the DCS case plan. He also maintained a relationship with his child despite his incarceration, and was due to be released from incarceration shortly after the date of the termination hearing. On appeal, we acknowledged that the father might be unable to quickly establish a stable life. But given his progress in complying with the case plan and the finality of the termination of parental rights, we concluded that not all reasonable efforts had been employed to reunite the father with his child and that DCS failed to carry its burden of showing that the reasons for placement of the child outside of the father's home would not be remedied. *Id*. 856.

[31] Mother argues that the same is true here. We disagree. Here, the reason for Son's placement outside of Mother's home was her use of drugs, not her incarceration. Mother was in jail for a period of the CHINS case—she was arrested on July 6, 2017 and released on bond on August 1, 2017. But for the majority of the CHINS proceedings she was not incarcerated and still made little progress in her participation in the offered services. To the contrary, she repeatedly tested positive for illicit drug use. Accordingly, we do not think *M.W.* is controlling here.[7]

[32] In short, the trial court did not clearly err in concluding that termination of Mother's parental rights was in the best interests of her child.

---

[7] We find Mother's citations to cases similar to *M.W.* unavailing for the same reasons.

## Conclusion

Nearly all cases involving the termination of parental rights are tragic. This case is no different. We have no reason to doubt Mother's claims that she and Son love one another and are bonded. But that does not make the termination of her parental rights improper; it merely makes it all the more heartbreaking that Mother has proven herself incapable of conquering her substance abuse problem. Mother's argument on appeal is little more than a request that we consider the evidence in her favor and come to a conclusion other than that reached by the trial court. This, of course, we cannot do. Considering the facts favorable to the trial court's decision, and the reasonable inferences that may be drawn therefrom, we cannot say that the trial court clearly erred in terminating Mother's parental rights.

Affirmed.

Najam, J., and Barnes, J., concur.